270 F.3d 821 (9th Cir. 2001)
 FOAD CONSULTING GROUP, INC., A CALIFORNIA CORPORATION PLAINTIFF-APPELLANT,
v.
MUSIL GOVAN AZZALINO, AN ARCHITECTURAL DEVELOPMENT, A CALIFORNIA CORPORATION; LARRY MUSIL; AGRA LLC; CANYON PARTNERS, INC., A CALIFORNIA CORPORATION; HAWKEYE INVESTMENTS LLC, A CALIFORNIA LIMITED LIABILITY COMPANY, DEFENDANTS-APPELLEES.
 No. 98-56017
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted December 8, 1999
Filed October 30, 2001
 
 [Copyrighted Material Omitted]
 John W. Belsher, Belsher & Becker, San Luis Obispo, California, for the plaintiff-appellant.
 Thomas F. Winfield, III, Brown, Winfield & Canzoneri, Inc., Los Angeles, California, Christopher Norgaard, Newell Campbell & Roche LLP, Los Angeles, California, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Terry J. Hatter, Jr., Chief District Judge, Presiding. D.C. No. CV-97-06152-TJH.
 Before: B. Fletcher, Kozinski, and Thompson, Circuit Judges.
 Opinion by Judge B. Fletcher; Concurrence by Judge Kozinski
 BETTY B. FLETCHER, Circuit Judge:
 
 
 1
 In this copyright case, we must decide an issue unaddressed by our prior decisions: Which law, state or federal, governs the creation of an implied, nonexclusive copyright license? We conclude that while federal law answers the threshold question of whether an implied, nonexclusive copyright license can be granted (it can), state law determines the contract question: whether a copyright holder has, in fact, granted such a license. Construing California law and applying it to the facts of this case, we conclude that Foad Consulting Group, Inc., gave an implied, nonexclusive license to the predecessor in interest of defendants Canyon Partners, LLC, and Agra, LLC, to reproduce and adapt the revised project plan at issue in this case and to publish the subsequent work, all in conjunction with defendants' development of a shopping center. Because we also conclude that defendants' modification and use of the plans did not exceed the scope of the implied license, we affirm the district court's grant of summary judgment to defendants.
 
 BACKGROUND
 
 2
 In August 1995, GenCom, Inc., hired the engineering firm Foad Consulting Group, Inc. to create a "preliminary Concept Development Plan" for a 45.5 acre shopping center project (the project) that GenCom intended to build in Arroyo Grande, California (the city). Pursuant to a contract dated August 18, 1995, Foad prepared a preliminary plot plan that showed the "location of the proposed buildings, parking lots, [and] landscape areas." GenCom submitted this plan to the city on January 3, 1996, as part of its application to build the shopping center. GenCom and Foad entered into a second contract, dated February 12, 1996, under which Foad agreed to create "final engineering drawings" for the project, including a revised plot plan, and to "process the[various] plans through the offices of the city of Arroyo Grande. " The revised plot plan was subsequently submitted to the city,[1] and the city approved GenCom's application for the project on July 9, 1996.
 
 
 3
 After it obtained the city's approval, GenCom transferred its rights to develop the project to Claire Enterprises, LLC.[2] In October 1996, Claire hired Hawkeye Investments, LLC, as the project's developer. Hawkeye, in turn, hired the predecessor of Musil Govan Azzalino (MGA), to perform architectural and engineering services.[3] MGA obtained copies of the revised plot plan and other documents from the city; it also obtained copies of various documents relating to the project from Foad. Based on the plot plan approved by the city, and suggestions and requirements of the project owners, the city, and potential tenants, MGA prepared final site plans for the project. In creating the final site plan, MGA copied much of Foad's revised plot plan by tracing from it onto an overlay. The developers wished to substantially revise Foad's plan, but the city was unwilling to allow major deviation from the plan that it had already approved. MGA circulated the final site plans to the city as well as to the shopping center's potential tenants.
 
 
 4
 Concerned that its copyright was being infringed, Foad sent a letter of admonition to MGA, dated February 3, 1997, informing MGA that Foad's revised plot plan was copyrighted and that Foad would pursue any violation of its copyright in federal court. Foad also obtained a Certificate of Registration for the revised plot plan from the Register of Copyrights, which is also dated February 3, 1997. On August 15, 1997, Foad filed a complaint in federal district court alleging copyright infringement.[4] On April 15, 1998, the district court heard defendants' motion for summary judgment. It granted the motion because it concluded that the merger doctrine applied.[5] On April 17, the court entered final judgment for the defendants. Foad timely appealed.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 5
 The district court had jurisdiction under 28 U.S.C. &#167 1338(a). We have jurisdiction over Foad's appeal pursuant to 28 U.S.C. &#167 1291. We review de novo a district court's determination of pure questions of law at summary judgment. Royal Foods Co., Inc. v. RJR Holdings, Inc., 252 F.3d 1102, 1106 (9th Cir. 2001).
 
 DISCUSSION
 I.
 
 6
 One who owns a copyright in a work has the exclusive right to reproduce, adapt, publish, perform, and display the work. 17 U.S.C. &#167 106. A copyright holder may transfer any or all of these rights, id. &#167 201(d)(2), but in order for the transfer to be valid it must be in writing, id. &#167 204(a).
 
 
 7
 Foad argues that defendants infringed its copyright in the revised plot plan by copying and modifying it and by publishing the resulting work.[6] Defendants also infringed its reproduction rights, Foad contends, by using the revised plot plan without its permission to build the project. They infringed its exclusive right to adapt the revised plot plan by using it as a basis for the final site plan. And by filing the final site plan with the city and circulating it among prospective tenants, defendants infringed Foad's publication rights. There is nothing in either contract between GenCom and Foad which purports to transfer any of Foad's exclusive rights to GenCom, and defendants do not point to any other writing that evidences a transfer of copyright. Thus, we cannot conclude from the writings that Foad transferred to GenCom explicitly its reproduction, adaptation, and publication rights in the revised plot plan.
 
 II.
 
 8
 We have recognized, however, that &#167 204(a)'s writing requirement applies only to the transfer of exclusive rights; grants of nonexclusive copyright licenses need not be in writing.[7] Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990). So we must consider whether Foad granted GenCom a nonexclusive license to copy and modify its revised plot plan and to publish the resulting work. A nonexclusive copyright license may be granted orally or by implication. Effects Associates, 908 F.2d at 558. Defendants argue that Foad granted GenCom an implied license to reproduce, adapt, and publish in the February 1996 contract between the parties. We agree that the contract grants GenCom an implied license to use the revised plot plan to complete development of the project, to hire another firm to create derivative works using the revised plot plan for the purpose of completing the project, and to publish the resulting work.
 
 
 9
 Foad asks us to consider certain extrinsic evidence in interpreting the contract.[8] The contract was formed in California, concerns work that was done in California, and contains a choice-of-law clause that identifies California law as governing its interpretation. In contrast to many other states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous. Compare City of Manhattan Beach v. Superior Court , 914 P.2d 160, 169 (Cal. 1996) (" `[T]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' " (quoting Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644 (1968)) with, e.g., Namad v. Salomon Inc., 543 N.E.2d 722, 723 (N.Y. 1989) ("Parol evidence is inadmissible if a contract is clear on its face and sufficient alone to divine the intent of the parties."). Thus, if state law determines whether an implied, nonexclusive copyright license has been granted, we should consider whether Foad's extrinsic evidence discloses a latent ambiguity in the contract. If state law does not apply, then we will need to consider whether the extrinsic evidence is admissible under federal common law. Cf. Itar-Tass Russian News Agency v. Russian Kurier, Inc., 153 F.3d 82, 90 (2d Cir. 1998) (developing federal common law to decide a conflicts of law issue in a copyright case, where the Copyright Act does not contain a controlling provision). Accordingly, before we interpret the contract between Foad and GenCom, we consider whether federal or state law determines whether a copyright holder has granted an implied, non-exclusive copyright license to another.[9]
 
 
 10
 As a general matter, we rely on state law to fill in the gaps Congress leaves in federal statutes. PM Group Life Ins. Co. v. W. Growers Assurance Trust, 953 F.2d 543, 546 (9th Cir. 1992). "The case for adopting state law rules is strongest where Congress legislates interstitially, leaving state law largely undisturbed. Under those circumstances, comity and common sense counsel against exercising the power of federal courts to fashion rules of decision as a matter of federal common law." Id. In enacting the Copyright Act, Congress did not preempt the field. Morseburg v. Balyon, 621 F.2d 972, 977-78 (9th Cir. 1980) (discussing Goldstein v. Cal. , 412 U.S. 546 (1973)). Thus, where the Copyright Act does not address an issue, we turn to state law to resolve the matter, so long as state law does not otherwise conflict with the Copyright Act. See, e.g., Sun Microsys., Inc. v. Microsoft Corp. , 188 F.3d 1115, 1122 (9th Cir. 1999) (stating that we "rely on state law to provide the canons of contractual construction provided that such rules do not interfere with federal copyright law or policy" (internal quotation marks and citation omitted)); Rano v. Sipa Press, Inc., 987 F.2d 580, 585 (9th Cir. 1993) (rejecting California rule that "agreements of non-specified duration are terminable at the will of either party" because the rule directly conflicts with federal copyright law); Barris Indus., Inc. v. Worldvision Enters., Inc., 875 F.2d 1446, 1449-50 (9th Cir. 1989) (stating that state contract law determines ownership of federal statutory royalties due copyright owners); Dolch v. United Cal. Bank, 702 F.2d 178, 180 (9th Cir. 1983) (stating that while the assignability of copyright renewal rights is a federal question, the conditions for valid assignment is a question of state law); Topolos v. Caldewey, 698 F.2d 991, 993-94 (9th Cir. 1983) (stating that ownership of a copyright is a matter of state contract law); cf. Aronson v. Quick Point Pencil Co., 440 U.S. 257, 263 (1979) ("State law is not displaced merely because the contract relates to intellectual property which may or may not be patentable; the states are free to regulate the use of such intellectual property in any manner not inconsistent with federal law."). There is no reason we should treat implied copyright licenses any differently. Congress did not choose to regulate the conditions under which a copyright holder can grant a nonexclusive copyright license to another. Thus, so long as it does not conflict with the Copyright Act, state law determines whether a copyright holder has granted such a license.[10]
 
 
 11
 We must ask, then, whether California's parol evidence rule conflicts with federal copyright law or policy. The principle effect of the California parol evidence rule is to lessen the importance of written contracts. It does so because the rule requires courts to consider extrinsic evidence of possible ambiguity even where the terms of the contract appear unequivocal. And if a party's extrinsic evidence creates the possibility of ambiguity, a court may not rely on the text of the contract alone to determine the intent of the parties. See Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564, 568-69 (9th Cir. 1988). The Copyright Act places great emphasis on the necessity of writings to grant exclusive licenses, but not when it comes to granting nonexclusive licenses: As we have noted, nonexclusive licenses may be granted orally. Thus, if a copyright holder and another have a contract that clearly does not grant the other an exclusive copyright license, in a copyright infringement suit the other may nonetheless introduce nonwritten evidence--such as testimony, course of conduct, and custom and practice--to show that the copyright holder orally granted her a nonexclusive license.[11] Since the Copyright Act itself places no particular emphasis on writings in the case of nonexclusive licenses, we conclude that application of California's parol evidence rule in interpreting a contract that a party purports to have granted an implied copyright license does not conflict with the Act or its underlying policies.
 
 III.
 
 12
 We must now determine whether the February 1996 contract between Foad and GenCom granted GenCom an implied copyright license. In this analysis, we consider whether Foad's extrinsic evidence discloses any ambiguities in the contract.
 
 
 13
 a. License to Reproduce
 
 
 14
 Foad claims that defendants infringed its reproduction rights to build the project by using the revised plot plan without its permission. We conclude from the terms of the contract that Foad granted GenCom an implied license to do just that. The central purpose of the contract was the production of a set of engineering documents "for `The Grande Plaza' Commercial Center in the city of Arroyo Grande." Under the contract, Foad agreed to create multiple maps, drawings, and plans for the project and to "process" these documents with the city. For this service, GenCom agreed to pay Foad a fee of $175,000. Given the amount of money GenCom paid for Foad's services and because part of the agreement was for Foad to help GenCom with its application to the city, it would be surprising if the parties had intended for GenCom to seek Foad's permission before using the plans to build the project. Had that been the parties' intention, one would expect to see the requirement spelled out explicitly in the agreement. But nowhere does the contract state that after the city had granted its approval, GenCom would need to obtain Foad's permission before commencing work. We conclude that the contract gives GenCom an implied license to use the revised plot plan to build the project.[12]
 
 
 15
 As evidence that the contract indicates the parties' intent to restrict GenCom's ability to use the revised plot plan without Foad's approval, Foad asks us to consider a legend that appears on the plan. The legend reads:
 
 
 16
 All ideas, designs, arrangements and plans indicated or represented by this drawing are owned by, and the property of Foad Consulting Group, Inc. and were created, evolved and developed for use on, and in connection with the specified project. None of such ideas, designs, arrangements or plans shall be used without written permission of Foad Consulting Group, Inc.
 
 
 17
 This legend does not divulge a latent ambiguity in the contract, much less show that under the contract Foad's permission was required before GenCom could start work. It is patent that the plans were developed for use on the specific project that was built. Although the legend states that no "plans shall be used without written permission of Foad," it appears on a document that was created after the agreement was made, and presumably was written by Foad or its agent. What's more, the legend would apply, if at all, to projects other than the specified project. Foad offers no explanation of how such a statement calls into question the parties' intent, as manifested by the contract, that GenCom would pay Foad for plans that it could use to develop its property.[13] Cf. Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co., 959 P.2d 265, 272 (Cal. 1998) ("The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (internal quotation marks and citation omitted) (emphasis added)).
 
 
 18
 b. License to Adapt
 
 
 19
 Foad next alleges that defendants infringed its adaptation rights by using much of the revised plot plan in creating the final site plan. But the February 1996 contract contains no language prohibiting others from modifying the revised plot plan. Quite the opposite: The contract contains a clause requiring GenCom to indemnify Foad in the event that others modify the plan and the changes lead to some liability.[14] In addition, that clause does not require GenCom to obtain Foad's consent in order to modify the plans; it only requires consent in order to avoid Foad's waiver of liability. The indemnification clause plus the absence of any prohibition against modification by others indicates that the contract granted GenCom an implied license to hire others to create derivative works using the revised plot plan for the purpose of completing the project.[15]
 
 
 20
 Foad points to paragraph 12 of the contract in support of its argument that it did not grant GenCom a license to hire another company to complete the project using the revised plot plan. Paragraph 12 states:
 
 
 21
 All original drawings, plans, documents, other papers and copies thereof prepared in connection with this agreement will remain the property of FOAD CONSULTING GROUP, INC. and may be used without the consent of the client and/owner(s). [T]he aforementioned papers will be kept on file by FOAD CONSULTING GROUP, INC. and copies will be provided to the client and/owner(s) at client and/owner(s)'s request, and at client and/owner(s)'s expense.
 
 
 22
 The paragraph provides Foad no support. It concerns ownership of the original documents and copies prepared by Foad under the agreement. It also makes plain Foad's intention to retain its right to "use" the documents, presumably by reproduction, adaptation, or publication. However, the paragraph is silent about what GenCom may or may not do with the copies prepared for it.
 
 
 23
 Foad also asks us to consider extrinsic evidence: a declaration from an alleged architectural expert who asserted that, under the custom and practice in the industry, a plan "may not be used to produce a similar plan, without the permission of the original designer."[16] This statement does nothing to undermine our conclusion that the contract grants GenCom an implied license to modify the revised plot plan. The contract protects Foad against any liability that might arise from a plan modified by others while imposing no restriction on such modifications. Even assuming that industry custom and practice requires a client to obtain an engineer's consent before modifying a plan created by the engineer, we conclude that the contract gave GenCom the requisite permission.
 
 
 24
 c. License to Publish
 
 
 25
 Finally, Foad contends that defendants infringed its publication rights by filing the final site plan with the city and circulating it among prospective tenants. The conclusion that the February 1996 contract granted GenCom an implied license to file the final site plan with the city and to use the plan to attract potential tenants follows from our previous analysis. The contract granted GenCom a license to reproduce and adapt the revised plot plan for the purpose of developing the project. It would defy common sense to conclude that the contract at the same time withheld permission to publish the resulting work for the same purpose. In the absence of a contractual provision concerning GenCom's right to circulate any derivative works as part of its development of the project, we conclude that GenCom did not infringe Foad's publication rights.
 
 IV.
 
 26
 The February 1996 contract contains a clause prohibiting either party from assigning any rights under the contract without the written consent of the other.[17] There is no evidence in the record that GenCom obtained Foad's written permission to assign its rights under the contract to its successor. Foad argues that, even assuming that Foad granted GenCom an implied license to reproduce, copy, and publish, in the absence of Foad's written consent to an assignment of rights, GenCom's license was not passed on to its successor. California law, however, is to the contrary. In California, contractual "provisions against assignment . . . are for the benefit of the vendor only, and in no way affect the validity of an assignment without consent as between the assignor and assignee." Johnson v. Landucci, 130 P.2d 405, 408 (Cal. 1942) (in bank); accord Klamath Land & Cattle Co. v. Roemer, 91 Cal. Rptr. 112, 115-16 (Cal. Ct. App. 1970). The limitation on assignment contained in the contract between Foad and GenCom does not affect the validity of GenCom's transfer of its development rights, including its rights concerning the revised plot plan, to its successor-in-interest.[18]
 
 CONCLUSION
 
 27
 The Copyright Act permits copyright holders to grant non-exclusive copyright licenses by implication. But whether a copyright holder has properly granted another a nonexclusive license by implication is a matter of state contract law, provided that the state law does not conflict with the Copyright Act or its underlying policies. In this case, the February 1996 contract granted GenCom an implied license to copy and adapt Foad's revised plot plan and to publish the resulting derivative work in aid of constructing the project for which it was designed. The extrinsic evidence which we consider as required by California law reveals no latent ambiguity in the contract. The defendants did not exceed the scope of the license by using the revised plot plan to create a final site plan, build the project, and publish the final site plan. Finally, the clause in the contract limiting assignments does not affect the validity of GenCom's transfer of its development rights. For these reasons, the district court's grant of summary judgment to defendants is
 
 AFFIRMED.[19]
 
 
 Notes:
 
 
 [1]
 It is unclear from the record whether GenCom submitted the revised plot plan or Foad did so as part of its agreement to"process" the plans with the city.
 
 
 [2]
 Claire Enterprises thereafter transferred its interest in the project to Canyon Partners, Inc., which then transferred the development rights to Agra, LLC.
 
 
 [3]
 Defendant Larry Musil is a principal of MGA. We will not distinguish between MGA and its predecessor and will refer to both as "MGA."
 
 
 [4]
 In addition, Foad filed a state-court action against Claire Enterprises. Foad and Claire settled that suit.
 
 
 [5]
 While the "expression" of an idea can be copyrighted, an idea itself cannot. 17 U.S.C. &#167 102(b); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547 (1985). "Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea. In such an instance, it is said that the work's idea and expression `merge.' " Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1082 (9th Cir. 2000).
 
 
 [6]
 We will use "copy" and"modify" as synonyms for, respectively, "reproduce" and "adapt."
 
 
 [7]
 By its terms, the Copyright Act's writing requirement applies only to a "transfer of copyright ownership." Id . &#167 204(a). The Act defines "transfer of copyright ownership" as "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. &#167 101. Thus, the requirement does not apply to the transfer of nonexclusive copyright licenses.
 
 
 [8]
 Specifically, Foad asks us to consider a copyright notice that appears in a legend on the revised plot plan and the affidavit of a planning and architectural expert concerning industry custom and practice.
 
 
 [9]
 Cases from other circuits provide little guidance on this issue. Some recognize that the Copyright Act permits copyright holders to grant nonexclusive licenses by implication but fail to discuss what law determines whether such a license has been granted. See, e.g., Johnson v. Jones, 149 F.3d 494, 500 (6th Cir. 1998); Pinkham v. Sara Lee Corp., 983 F.2d 824, 830-31 (8th Cir. 1992); MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc., 952 F.2d 769, 778-79 (3d Cir. 1991). Others rely on a leading copyright treatise for the principle that a copyright holder grants another a nonexclusive license " `[w]hen the totality of the parties' conduct indicates an intent to grant such permission' " but fail to explain the source of the principle. Lulirama Ltd., Inc. v. Axcess Broadcast Serv., Inc., 128 F.3d 872, 879 (5th Cir. 1997) (quoting 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT &#167 10.03[A], at 10-41 (1997)). Still others rely on the same treatise for the proposition that the validity and scope of implied copyright licenses are generally determined by state law but provide little or no analysis of the issue. See, e.g., Jacob Maxwell, Inc. v. Veeck, 110 F.3d 749, 752 n.2 (11th Cir. 1997) (citing Fantastic Fakes, Inc. v. Pickwick Int'l, Inc., 661 F.2d 479, 483 (5th Cir. 1981), and NIMMER & NIMMER, supra, &#167 12.01[A], at 12-8 n.19); I.A.E., Inc. v. Shaver, 74 F.3d 768, 774 n.4 (7th Cir. 1996) (citing NIMMER & NIMMER, supra, &#167 12.01[A], at 12-8 & n.19).
 
 
 [10]
 In Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990), we held that the Copyright Act permits a copyright holder to grant a nonexclusive copyright license by implication and that Effects Associates had granted an implied license to Cohen. In reaching the latter conclusion, we did not consider whether federal or state law determines the circumstances under which a copyright holder has validly granted another an implied copyright license. This is not surprising, since the choice-of-law issue was not material to our determination of the case. Effects Associates stands for the principle that a seller grants a buyer an implied license to use a product for the purpose for which the seller sold it to the buyer. We can find no California cases on point, but we have no reservations about predicting that were the California Supreme Court to be presented with the issue, it would adopt this common-sense principle underlying Effects Associates. Since Effects Associates' finding of an implied license is consistent with California law, it is consistent with our holding that state law generally determines whether a copyright holder has granted an implied license.
 
 
 [11]
 Of course, to be enforceable, the oral grant would have to be backed by consideration and otherwise satisfy the formation requirements of state contract law. Cf. McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917, 920 (Fed. Cir. 1995) ("Whether express or implied, a license is a contract governed by ordinary principles of state contract law. " (internal quotation marks and citation omitted)) (patent and trademark infringement case).
 
 
 [12]
 If accepted, Foad's claim that although it was hired to create documents for the project, GenCom had no right to use the documents to build the project, would allow architectural or engineering firms to hold entire projects hostage, forcing the owner either to pay the firm off, continue to employ it, or forego the value of all work completed so far and start from scratch. If the client did not want to pay the firm's ransom demand, the client might be willing to incur the costs of starting from scratch. Going back to the drawing board, however, may not be an option where necessary government approvals have already been obtained and the approving authority is unwilling to reconsider the issue, as happened here. Alternatively, the firm's ransom demand might be unreasonable. One would expect project owners to think long and hard before placing their fortunes so entirely in the hands of a single firm. And one would expect that a firm that intended to exercise such ongoing control over a project would clearly specify this in a contract. Cf., e.g., infra note NOTE 1515.
 
 
 [13]
 We also note that Foad's legend overreaches by asserting ownership of the ideas represented by the plan: Copyright law protects only the expression of ideas, not ideas themselves. 17 U.S.C. &#167 102(b); Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547 (1985).
 
 
 [14]
 Paragraph 19 of the contract states:
 In the event that any changes are made in the plans and specifications by client or persons other than consultant, any and all liability arising out of such changes is waived as against consultant and client assumes full responsibility for such changes unless client has given consultant prior notice and has received from consultant written consent for such changes.
 The dissent analogizes to indemnity provisions in car rental agreements, claiming they forbid rather than allow the described conduct. The analogy is not apt-car rental agreements, unlike the agreement here, expressly forbid the conduct for which indemnity is required. Here the implication is the opposite.
 
 
 [15]
 This case is distinguishable from Johnson v. Jones, 149 F.3d 494 (6th Cir. 1998). Johnson was an architect who was hired by Jones to create plans for a " `dream house.' " Id . at 497. After the plans had been submitted to the city, the parties' contract negotiations collapsed and Jones fired Johnson. Id. at 498-99. Jones subsequently hired new architects to complete the project, and they used Johnson's plans in doing so. Id. at 499. Johnson sued for copyright infringement. In the face of Jones' claim that Johnson had granted her an implied license to use the plans, Johnson presented evidence that he had twice presented Jones with a contract that expressly provided that "[d]rawings, specifications and other documents shall not be used by the Owner on other projects, additions to this project, or . . . for completion of this Project by others, except by written agreement relating to use, liability, and compensation ." Id. at 498 (emphasis and omission in original). Johnson also showed that while Jones had not signed the contract, she asked him to continue working. Id. The Sixth Circuit held that under these facts, Jones had notice that Johnson intended to retain control over his designs and any derivative works necessary to complete the project and that he had not granted Jones an implied license to reproduce or modify the plans. Id. at 500-02.
 
 
 [16]
 The parties dispute whether the expert's affidavit was properly before the district court. We need not resolve this issue because we conclude that the affidavit does not affect our interpretation of the contract.
 
 
 [17]
 Paragraph 35 states:
 This Agreement binds consultant and client and their successors, assigns and partners. Neither party shall assign, sublet or transfer its interests, rights or obligations in this Agreement without the written consent of the other party hereto.
 
 
 [18]
 Although "the interest of the assignor in the contract passes to the assignee" even in the face of a non-assignment clause, the transfer of rights is "subject to the rights of the original seller." Landucci, 130 P.2d at 408. Thus, if GenCom impermissibly assigned its rights in the revised plot plan, Foad may have a claim for breach of contract. We state no opinion concerning the merits of such a claim.
 
 
 [19]
 We may affirm a decision of the district court on any ground supported by the record. Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001). Because we conclude that the contract granted GenCom an implied copyright license, we do not consider whether the district court properly relied on the merger doctrine in reaching its decision. Nor need we consider defendants' argument that their use of the revised plot plan was "fair use" under 17 U.S.C. &#167 107.
 
 
 KOZINSKI, Circuit Judge, concurring:
 
 28
 The parties will no doubt be surprised by the majority opinion, as it decides a question they neither briefed nor argued, and that wasn't even raised below. This is a dangerous thing for a court to do, and wholly unnecessary. The case can and should be decided on the issues presented by the parties. Because I cannot join in the court's analysis, I concur only in the result.
 
 I.
 
 29
 A. The majority opens with the following question: "Which law, state or federal, governs the creation of an implied, nonexclusive copyright license?" Maj. Op. at 824. It is an interesting question that deserves exploring in the right case. It is also a difficult question that bears some analysis. Instead, the majority cites Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir. 1990), and then proceeds to apply state law. Given the importance of the question, one might have hoped for some explanation of how the majority got there.
 
 
 30
 As best I can tell, the majority assumes that anything that is called a contract--including an implied contract--must be governed by state law. But not every implied contract is, in fact, a contract. Certainly, some implied contracts are governed by state law. Those contracts really are contracts; they are actual agreements between parties, albeit imperfectly articulated. The cases on which the majority relies all involve this type of contract. Maj. Op. at 825-26.
 
 
 31
 But there is another type of implied contract, one that is "created otherwise than by assent and without any words or conduct that are interpreted as promissory." 3 Arthur Linton Corbin, Corbin on Contracts &#167 561, at 276-77 (1960). Such an implied contract is not a contract at all; it is a legal obligation the law imposes between certain parties where there is no actual agreement between them. Id. If the implied contract that gives rise to the nonexclusive license discussed in Effects Associates is this kind of contract, then it has nothing at all to do with contract law. Rather, it is an incident of the copyright and is therefore governed by federal law.
 
 
 32
 In Effects Associates, we imposed a non-exclusive license as an incident of the transfer of the copyrighted work but did not expressly say that it was a creation of federal law. I believe that this was the clear implication of our ruling, but I would leave resolution of the question to a case where the issue is properly raised below and the parties have briefed and argued it before us. In this case, I would decide the question as a matter of federal law, as the parties and district court assumed it is.
 
 
 33
 B. Purporting to apply state law, the majority infers "from the terms of the contract" that Foad and GenCom agreed to a nonexclusive license. Maj. Op. at 828. Yet there is nothing in the written contract between Foad and GenCom that remotely touches upon the plans' copyright. The contract says nothing about whether GenCom had the right to modify or distribute the plans. It says nothing about the circumstances in which GenCom can use the plans to build the project. The parties seem to have negotiated, written and signed the contract without ever discussing (or perhaps being aware of) these copyright issues. The majority acknowledges as much when it concedes that neither contract was sufficient to provide for a written transfer of copyright ownership because "[t]here is nothing in either contract between GenCom and Foad which purports to transfer any of Foad's exclusive rights to GenCom." Maj. Op. at 825.
 
 
 34
 Which leads to the question: Exactly which terms of the contract give rise to the license? The majority never says, relying instead on what the contract does not say. The majority notes that Foad failed to "spell[ ] out explicitly in the agreement" a requirement that "GenCom . . . seek Foad's permission before using the plans to build the project. " Maj. Op. at 829. In other words, Foad's failure to expressly reserve its rights raises an implication that Foad licensed those rights. This makes intuitive sense but, as we are applying state law, I would have expected to see state caselaw or a state law treatise cited on this point. The majority offers no state law authority to support its conclusion that a court can infer an agreement from the absence of a contrary agreement. Id.
 
 
 35
 Even more troubling is the majority's reliance on the penumbras emanating from an indemnification clause. The majority says that the written contract's "indemnification clause plus the absence of any prohibition against modification by others indicates that the contract granted GenCom an implied license to hire others to create derivative works using the revised plot plan for the purpose of completing the project." Maj. Op. at 830. The majority cites no state law authority for this point, either, and I doubt it can be found. Indemnification is not authorization. Usually, it's the other way around: A party seeks indemnification against another party's unauthorized actions. For example, rental car companies routinely require customers to indemnify them against harm caused by underage drivers, but this does not mean they authorize their customers to give the car keys to children. The majority's conclusion that an indemnification clause creates a presumption that the indemnified-for act is authorized is almost certainly inconsistent with state law.
 
 
 36
 C. Part III of the opinion devotes considerable effort to figuring out whether the implied copyright license previously found to exist is nonetheless defeated by parol evidence. This makes about as much sense as calculating how high is up.
 
 
 37
 Parol evidence consists of words or conduct outside the contract that tends to vary or explain the contract's written terms. The majority correctly recognizes that California has a particularly broad version of the parol evidence rule, which permits a court to examine such evidence even when the contract appears to be clear on its face; other states have a narrower version of the rule, which prohibits reference to parol evidence unless the contract terms are ambiguous. In either event, however, the parol evidence is used to shed light on words actually used in the contract.
 
 
 38
 The implied copyright license here is not a term in the contract; rather, as the name suggests, it's a term that is implied from the relationship of the parties. In such circumstances, it makes no sense at all to talk about parol evidence, or to consider whether California applies a broad or narrow parol evidence rule. There are no words of the contact that the parol evidence here can be used to interpret or clarify.
 
 
 39
 Evidence extrinsic to the contract is, of course, not irrelevant. Because the implied license is derived from the relationship of the parties--which may well extend beyond the contract--it is entirely appropriate to look at any words or conduct that bear on whether a copyright license should be implied. But that is not a question of parol evidence; rather, it goes to whether such a license exists in the first place.
 
 
 40
 D. The majority's preemption analysis is incomplete. The Copyright Act has a specific preemption provision, 17 U.S.C. &#167 301, but the majority does not cite it. Normally, of course, section 301 is the start of any preemption analysis in a copyright case, see, e.g., Kodadek v. MTV Networks, Inc., 152 F.3d 1209, 1212 (9th Cir. 1998); Anderson v. Nidorf, 26 F.3d 100, 102 (9th Cir. 1994), so the majority's assertion that "[i]n enacting the Copyright Act, Congress did not preempt the field," is at least incomplete. Maj. Op. at 827. Other courts have devoted considerable discussion to section 301 in resolving the tension between state contract law and federal copyright laws. See Wrench LLC v. Taco Bell Corp., 256 F.3d 446, 453-59 (6th Cir. 2001) (holding that the Copyright Act does not preempt a state breach of implied-in-fact contract claim); Selby v. New Line Cinema Corp., 96 F. Supp. 2d 1053, 1057-62 (C.D. Cal. 2000) (holding that the Copyright Act preempts a state breach of contract claim); Endemol Entm't B.V. v. Twentieth Television Inc., 48 U.S.P.Q.2d 1524, 1526-28, 1998 WL 785300 (C.D. Cal. 1998) (same).
 
 
 41
 This analysis is also beside the point. The majority purports to hold that application of the parol evidence rule is not pre-empted by the Copyright Act but, for reasons pointed out above, the parol evidence rule has no relevance to our case, so we have no occasion to speak to the issue. See Part I.C supra. However, the parol evidence rule may well be quite relevant in a case where the contract contains an express copyright license and the parol evidence is being offered to undermine or vary the terms of that license. I am not at all sure whether, in such a case, applying California's broad version of the parol evidence rule is consistent with the federal copyright laws, which are designed to ensure certainty and predictability in the transfer of copyright. It is a question I would leave for a case where it is actually presented, rather than answering it in a case like ours, where no certainty is possible in any event because the written contract does not deal with the issue. I can only hope that future courts will not give undue deference to the majority's answer to a question that was neither posed by the parties nor presented by the facts of the case before us.
 
 II.
 
 42
 For my part, I would answer the question actually presented by the parties, which presupposes that the implied license in Effects Associates is a matter of federal law. Because I find the majority's analysis inapposite, I offer my own:
 
 
 43
 A. While an exclusive copyright license must be in writing, a nonexclusive license "may be granted orally, or may even be implied from conduct." Effects Assocs., 908 F.2d at 558 (citing 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright &#167 10.03[A], at 10-36 (1989)). In Effects Associates, we found that a special effects studio granted a nonexclusive implied license when it handed over film footage to the producer who had commissioned it. See Effects Assocs., 908 F.2d at 558-59. The studio had created and delivered special shots knowing they were to be incorporated into a film, and were of little value for anything else. See id. We held that the transaction had to be understood as contemplating a license to use the footage for the purpose for which it was created; otherwise, the producer's payment of a large sum of money would have been senseless. See id. at 559. Two other circuits have applied the teachings of Effects Associates to situations very similar to the one now before us, each involving the completion of building plans by someone other than the original architect. See Johnson v. Jones , 149 F.3d 494 (6th Cir. 1998); I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996).
 
 
 44
 In Shaver, an architect had created schematic design drawings for an air cargo building. See 74 F.3d at 770. The owners of the project hired another firm to finish the architectural work, and Shaver threatened to sue for copyright infringement. See id. at 771. The owners sought a declaratory judgment that they were not infringing, and won summary judgment. As the district court in that case put it, "Shaver granted the Airport a nonexclusive license to use his drawings as the basis for preparing working drawings and completing the project. Shaver's argument that the Airport can use the drawings only as pieces of paper (wallhangings? placemats?) is untenable." Id. at 772. The Seventh Circuit affirmed.
 
 
 45
 The architect in Johnson was hired to draw up plans for a client's "dream house." 149 F.3d at 497. After these plans had been submitted to the city for approval, the parties reached an impasse, and the client fired the architect. See id. at 498-99. When successor architects used the drawings to complete the project, Johnson successfully sued for copyright infringement, defeating defendants' claim that they had an implied license to use the drawings. See id. at 499-502.
 
 
 46
 In each of these cases, the architect, having agreed to provide the basic plans for a project, later asserted that the client had no right to make the derivative works necessary to complete that project without the architect's continued involvement. See Johnson, 149 F.3d at 500; Shaver, 74 F.3d at 778. If accepted, such a claim would allow the architect to hold the entire project hostage, forcing the owner either to continue to employ the architect or to forego the value of all work completed so far and start from scratch. Even assuming the client's willingness to incur this cost, going back to the drawing board may not be an option where necessary government approvals have already been obtained and the approving authority is unwilling to reconsider the issue, as happened here.
 
 
 47
 While Shaver and Johnson reach different results, they are not necessarily inconsistent. As I read the cases, the result in each turned on its facts. In Shaver, the court found no evidence that the implied nonexclusive license normally expected in such a situation had been withheld. See 74 F.3d at 776-77. The certificates of registration on Shaver's drawings stated that they were to be used for the airport facility. See id. at 776. The contract Shaver drew up demonstrated that he was hired to create preliminary drawings, but it reflected no expectation of further participation in the project. See id. Shaver had delivered his designs without any warning that their use would constitute copyright infringement, and even expressed hope that the ideas exhibited in his work would assist in successful realization of the project. See id. at 777.
 
 
 48
 In Johnson, the parties had never come to agreement on a final contract; that's why the client fired the architect. See 149 F.3d at 499. Johnson, however, had twice presented the client with a contract which expressly provided that the copyrighted drawings "shall not be used by the owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the architect is adjudged to be in default under this agreement, except by agreement in writing with appropriate compensation to the Architect." Id. at 498. While the client never signed this contract, she asked Johnson to continue working after he had given it to her, and she led him to believe that she eventually would sign it. See id. at 498. The client thus had fair notice that the architect intended to retain control over his designs and any derivative works necessary to complete the project. Under these circumstances, the district court had sufficient evidence from which to find that Johnson had never granted an implied license for the client to use the drawings without retaining him on the project.[1]
 
 B.
 
 49
 Looking at the relationship between Foad and GenCom, I conclude that this case is cut from the cloth of Shaver, not Johnson. Like Shaver, Foad drafted letter contracts that define a specific scope of work and mention no expectation of a continued role in the project. On each occasion, Foad agreed to generate a particular set of documents in exchange for a lump sum payment. In August 1995, Foad contracted to prepare "a preliminary site grading plan," for which it was paid $11,500. The February 1996 contract is more elaborate, and states that the work is to consist of "the preparation of final engineering drawings (Grading, Improvements, Final Map, Dimension Plot Plan, Site Plan) together with necessary field survey for the proposed . . . project." In exchange for all this, GenCom paid Foad a lump sum of $175,000. The overall project obviously was not finished, but for all I can tell from this contract, the relationship between GenCom and Foad was.
 
 
 50
 Nowhere does the contract contain a clause like those Johnson proposed, forbidding any additions to the project or completion of it by others. Foad asserts that the contract does say this, and points to the following paragraphs:
 
 
 51
 12. All original drawings, plans, documents, other papers and copies thereof prepared in connection with this agreement will remain the property of FOAD CONSULTING GROUP, INC. and may be used without the consent of the client and/owner(s). [T]he aforementioned papers will be kept on file by FOAD CONSULTING GROUP, INC. and copies will be provided to the client and/owner(s) at client and/owner(s)'s request, and at client and/owner(s)'s expense.
 
 
 52
 13. All documents, including drawings and specifications prepared by FOAD CONSULTING GROUP, INC., are not intended or represented to be suitable for reuse by client and/owner(s) or others without adaptation by FOAD CONSULTING GROUP, INC. [C]lient and/ owner(s) shall indemnify and hold harmless FOAD CONSULTING GROUP, INC. from any and all claims, damages, losses and expenses including attorney's fees arising out of or resulting from any use other than for the project which is the subject of this contract. Any such additions or adaptations will be billed as extra work at the current rate schedule.
 
 
 53
 Neither of these provisions speak to copyright. Paragraph 12 is clearly about the ownership of certain original papers, and is silent about what GenCom may or may not do with copies. Paragraph 13 is a disclaimer and indemnification clause. As I have discussed above, this has no bearing on the copyright issues in this case. See p. 833-34 supra.
 
 
 54
 Foad also points to the plan itself, which bears the following legend:
 
 
 55
 All ideas, designs, arrangements and plans indicated or represented by this drawing are owned by, and the property of Foad Consulting Group, Inc. and were created, evolved, and developed for use on, and in connection with the specified project. None of such ideas, designs, arrangements or plans shall be used without written permission of Foad Consulting Group, Inc.
 
 
 56
 The first problem with this, of course, is that copyright law does not authorize the ownership of ideas. See Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 547 (1985). In any case, this legend is reminiscent of Shaver's registration certificates, which said that the copyrighted designs were to be used for the airport facility in question. See Shaver, 74 F.3d at 776. It is difficult to see how an announcement that the plans were "created, evolved, and developed for use on, and in connection with the specified project" can be read to prohibit their use on and in connection with that very project. This sentence would serve no purpose if the one following it were intended to require written permission even for the very uses Foad intended.
 
 
 57
 Finally, Foad submitted a declaration from an architectural expert who asserted that, under custom and practice in the industry, a plan "may not be used to produce a similar plan, without the permission of the original designer."[2] This may be true, but begs the question whether "the totality of the parties' conduct indicates an intent to grant such permission." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright &#167 10.03[A][7], at 10-42 (2000). Foad created its revised plan at GenCom's request, knowing that this document was being used to obtain city approvals which would then be binding on the project. Foad drafted a contract which makes no mention of its copyright. Foad has presented nothing that casts doubt on the conclusion that the relationship between the parties gave rise to an implicit nonexclusive license in GenCom's favor.
 
 
 58
 Finding there was an implied license does not end the inquiry, however. We must also ask what the scope of this license was, and whether GenCom exceeded it. See Oddo v. Ries, 743 F.2d 630, 634 (9th Cir. 1984) (implied license to use articles in a manuscript did not include license to use them in a book). Here, Foad's own legend announces that the plans were created "for use on, and in connection with the specified project." The project was to build a shopping center on the site depicted in Foad's plan, and the derivative works created by defendants were used solely in furtherance of that purpose.
 
 
 59
 It is true that the details of this project have evolved since Foad's contribution to it. Any project, however, will undergo modifications along the way--whether because of site conditions that are discovered during construction, because the city planners make unanticipated demands, or because the economics of the situation change. To regard each such modification as resulting in a new project for purposes of the license would be to render the implied license useless, once again giving the plan designer, rather than the owner, total control over the development.
 
 
 60
 In making those derivative works necessary to complete the shopping center, defendants did not exceed the scope of their license to use Foad's plan in connection with the project for which it was created.
 
 
 
 Notes:
 
 
 [1]
 I disagree, however, with another reason the Sixth Circuit gave to support its holding on this point: "It is one thing for an architect to allow the owner to hire someone else to build a house from the architect's plans. It is quite another for the architect to allow a competitor to come in and claim the architect's work as his own." Johnson, 149 F.3d at 501. Foad too has complained about the fact that bragging rights for the completed project will accrue to the defendants, even though the plan was based largely on Foad's work. While misrepresentation as to the source of a design may be actionable under the Lanham Act, see id. at 502-03, or under state law, the author's interest in proper attribution is foreign to the Copyright Act, which "seeks to vindicate the economic, rather than the personal, rights of authors." Gilliam v. Am. Broad. Cos., 538 F.2d 14, 24 (2d Cir. 1976).
 
 
 [2]
 In Shaver too, the architect had offered extrinsic evidence of industry practice and custom, which the district court rejected as being unnecessary given that the contract was not ambiguous. See 74 F.3d at 772.