Meisner Brem Corp. v. Mitchell, et al CV-03-057-JM  04/15/04  P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


<u>Meisner Brem Corporation</u>


   v.                                    Civil No. 03-057-JM
                                         Opinion No. 2004 DNH 067
<u>Eric Mitchell, et al.</u>

**O R D E R**

Meisner Brem Corporation ("MBC") brought this copyright infringement action naming Eric Mitchell ("Mitchell"), Richard Ladd ("Ladd"), Eric Mitchell & Associates, Inc. ("EMA"), and Harvey G. Blettner ("Blettner") as defendants.  MBC alleges that Mitchell, Ladd and EMA produced, recorded, utilized, and placed on the market survey plans that are substantially similar to MBC's copyrighted work.  MBC further alleges that defendant Blettner induced, caused and materially contributed to that infringement.  MBC seeks compensatory damages and a permanent injunction enjoining the defendants from further infringement.

Defendants Ladd, Mitchell and EMA filed answers to the complaint denying MBC's allegations of material fact and raising affirmative defenses based on implied nonexclusive license, the doctrine of merger, and express retroactive license.  Since defendant Blettner did not file an answer or other responsive

pleading, the Clerk of Court entered a default as to Blettner on April 23, 2003 (document no. 10).  The other defendants subsequently moved for summary judgment under Fed. R. Civ. P. 56 (document nos. 11 and 12).  MBC filed an objection.

As discussed herein, the Court finds that defendants Ladd, Mitchell and EMA have demonstrated that there is no genuine issue of material fact as to their defense that they cannot be held liable on MBC's copyright infringement claim because MBC granted the owner of the project at issue a nonexclusive license to use MBC's subdivision plans, which extended to defendants' use of the plans.  Therefore, the motions for summary judgment are granted.

## Standard of Review

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party."  Anderson v.

2

Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  See id. at 248.

"Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  Id. at 324.  Evidence that is "merely colorable, or is not significantly probative" will not preclude summary judgment.  Anderson, 477 U.S. at 249-50 (citation omitted); see also, LeBlanc, 6 F.3d at 842 ("the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party.").

On a motion for summary judgment, the court construes the record in the light most favorable to the non-moving party, resolving all inferences in its favor, and determines whether the moving party is entitled to judgment as a matter of law.  Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).  The court

does not credit "conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Munoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990). Applying this standard, the facts are recited below.

<u>Background Facts</u>

MBC is engaged in the business of providing civil engineering and surveying services to real estate owners. MBC prepares subdivision design, roadway, and septic system plans. Mitchell is engaged in the business of providing civil engineering and surveying services through EMA. Ladd, sued only in his individual capacity, is the president of RSL Layout and Design, Inc. ("RSL"), which provides surveying services.

On or about May 14, 1998, MBC prepared a Proposal and Professional Service Agreement for the design and preparation of plans for a residential subdivision development on a parcel of real estate located off Cluff Road in Salem, New Hampshire. Ex. C to Pl.'s Objection and Ex. B to the Affidavit of Paul M. DeCarolis, Esq. ("DeCarolis Aff."). Shortly thereafter, defendant Blettner, who was then a joint owner of the real property, engaged MBC to provide engineering and surveying services for a development referred to as the "Cluff Estates"

4

project (hereinafter the "Project").[1]

MBC's General Terms and Conditions, Attachment A to the Professional Service Agreement, provides in paragraph 14 that:

> All documents, including Drawings, Specifications, estimates, field noted and other data, prepared or furnished by [MBC] (and [MBC] independent sub consultants) pursuant to this Agreement are instruments of service in respect of the Project and [MBC] shall retain an ownership and property interest therein whether or not the project is completed. Client may make and retain copies for information and reference in connection with the use and occupancy of the Project by the Client and others; however, such documents are not intended or represented to [sic] suitable for reuse by Client or others on extensions of the Project or on any other Project. Any reuse without written verification or adaptation by [MBC] for the specific purpose intended will be at Client's sole risk and without liability or legal exposure to [MBC] or to [MBC] sub consultants, and Client shall indemnify and hold harmless [MBC] and [MBC] sub consultants from all claims, damages, losses and expenses, including attorneys' fees arising out of or resulting therefrom. Any such verification or adaptation will entitle [MBC] to further compensation at rates to be agreed upon by Client and [MBC].

Pl.'s Objection, Ex. C.

Kurt Meisner ("Meisner"), the Vice-President of MBC, testified in a preceding litigation that MBC contracted to

---

[1]The parties do not specify when MBC was engaged, but there is no dispute that an agreement was reached. The Professional Service Agreement attached as Exhibit C to Plaintiff's Objection and as Exhibit B to the Decarolis Affidavit indicates that the total contract amount was $28,800 and that a retainer of $3,900 was paid on June 16, 1998.

provide a conceptual plan for the Project and a definitive plan, which "would be the preliminary final sub-division plans as the [town] planning board would see them." Deposition of Kurt Meisner, April 9, 2002, in the matter of Meisner Brem Corp. v. Blettner, et al., Rockingham Superior Court Docket No. 01-C-29 ("Meisner Dep.") at 45-46, Decarolis Aff., Ex. A. MBC produced, among other things, several conceptual plans for the subdivision. Affidavit of Kurt Meisner dated December 29, 2003 ("Meisner Aff."), ¶¶ 7-10, attached to Pl.'s Objection as Ex. B.

MBC's subdivision plans for the Project were submitted to the Salem Planning Board for approval on or about February 16, 1999. See Letter from Jeffrey A. Brem to Michael Lyons, Chairman of the Salem Planning Board, dated February 18, 2003, attached as Ex. A to the Affidavit of Michael S. Owen, Esq. ("Owen Aff."). Based on MBC's engineering drawings for the Project, the town planning board conditionally approved the plan for the Project in the summer of 2000. Meisner Aff., ¶ 14.; Owen Aff., Ex. A. MBC prepared all of the reports and documents necessary to gain all of the necessary permits and approvals from state agencies and enabled the Project to fulfill all of the town engineer's conditions for final approval of the subdivision plans. Meisner

6

Aff., ¶¶ 17-18.

While MBC was preparing the final engineering documents for the Project, MBC and the owners of the property reached an impasse over the payment of MBC's fees. Id., ¶ 19. In or about November 2000, Blettner terminated MBC and refused to pay anything further for its services.

In December 2000, the owners of the property hired Mitchell and Ladd and provided them copies of MBC's subdivision plans. RSL re-staked Cluff Road because Blettner's contractors could not match the location of the center line of the road staked by MBC with the lot lines and other monuments and landmarks reflected in the plans. Deposition of Richard S. Ladd, May 23, 2002 in the matter of Meisner Brem Corp. v. Blettner, et al., Rockingham County Superior Court Docket No. 01-C-29 ("Ladd Depo.") at ¶. 17-18, Decarolis Aff., Ex. C. Ladd testified that RSL recreated the surveying information for the entire subdivision in order to place the road after MBC refused to provide information Ladd needed to resolve what he considered to be a discrepancy in the road layout. Id. at ¶. 21-24; 37.

MBC learned of Mitchell's and Ladd's involvement with the Project when MBC was contacted by Ladd. Meisner Aff., ¶ 22. MBC

informed Ladd that MBC's plans were protected by copyright,[2] that Ladd did not have MBC's permission to use the plans, and that Ladd's use of the plans should cease immediately. Id., ¶ 23. MBC informed Ladd that it was still working on the subdivision, and that it had not been paid for its work. Id., ¶ 24.

RSL and Mitchell prepared the final engineering documents required for final approval, which are referred to as mylar recording documents. Id., ¶ 21. The RSL/Mitchell plans received final approval from the Salem Planning Board. Before the RSL/Mitchell plans were recorded, MBC brought this copyright infringement action on February 13, 2003. MBC notified the successor to the original Project owners that the plans could not be recorded because the plans were the subject of this lawsuit. See Letter from Michael D. Hatem, Esq. to John D. Mullen dated April 2, 2003, attached as Exhibit D to the Affidavit of Michael Owen ("Owen Aff."). As a result, the owner asked the town not to record the plans. See Letter from John D. Mullen to Ross A. Moldoff, Planning Director of the Town of Salem, dated March 19, 2003, Owen Aff., Exhibit C. On or about June 16, 2003, however,

_____

[2]On April 30, 2001, MBC received a certificate of registration from the United States Copyright Office for technical drawings of subdivision plans entitled "Cluff Estates."

8

MBC executed a release agreement granting the owner permission to record the RSL/Mitchell plans in exchange for a payment of $25,000.  Pl. Obj., Ex. D.

In their defense of this lawsuit, defendants deny that they copied MBC's plans and further deny that their plans are substantially similar to MBC's.  Defendants contend that they prepared new plans for the subdivision based on a new and original survey because they considered the work done by MBC flawed and unusable.  For purposes of the motions for summary judgment, however, defendants argue that MBC's copyright infringement claims fail based on their affirmative defenses.

## Discussion

A.   Implied Nonexclusive License

While transfers of copyright must be made in writing under 17 U.S.C. § 204(a), it is well-established that a copyright owner may orally grant a nonexclusive license where copyright ownership has not been transferred.  John G. Danielson, Inc. v. Winchester-Conant Props., 322 F.3d 26, 40 (1st Cir. 2003).  A nonexclusive license may also be implied from conduct that indicates the copyright owner's intent to allow a licensee to use the copyrighted work.  Id.  "Uses of the copyrighted work that stay

9

within the scope of a nonexclusive license are immunized from infringement suits." Id. (citing Graham v. James, 144 F.3d 229, 236 (2d Cir. 1998)). The party claiming the protection of a license has the burden of proving the existence of a license. Danielson, 322 F.3d at 40 (citing Bourne v. Walt Disney Co., 68 F.3d 621, 631 (2d Cir. 1995)).

The analytical framework for determining whether an implied license exists has three parts. Danielson, 322 F.3d at 41 (citing Effects Assoc., Inc., v. Cohen, 908 F.2d 555, 558-59 (9th Cir. 1990)). First, the licensee must have requested the creation of the work. Id. Second, the licensor must have created and delivered that work to the licensee. Id. And third, the licensor intended that the licensee distribute the work. Id. The copyright owner's intent is the "touchstone" for finding that an implied license exists. Id. at 40.

In the instant case, the first two prongs of the three-part analytical test have been satisfied in defendants' favor. There is no dispute that MBC created subdivision plans for the Project at defendant Blettner's request. Those plans were delivered to the Project owners, who submitted copies of the plans to the Town of Salem for conditional approval, and who later provided copies

of the plans to the defendants.

MBC's assertion that the Project owners did not fully pay for MBC's subdivision plans does not affect the implied license analysis. There is no evidence that full payment was a contractual precondition for MBC's grant of a license. See I.A.E., Inc. v. Shaver, 74 F.3d 768, 778 (7th Cir. 1996) (rejecting plaintiff's argument that an implied license "did not spring into existence" because only half the contract sum was paid); Effects Assoc., 908 F.2d at 559 n.7 (refusing to construe payment in full as a condition precedent to implying a license where such a condition was not required by plain, unambiguous contract language). The Court further finds inconsequential MBC's assertion that it did not deliver the "final set" of subdivision plans to the Project owners. MBC's copyright infringement claim pertains to the plans that were actually provided to the Project owners by MBC, not to those plans considered to be the final set. Therefore, the only issue that requires further discussion is whether MBC intended that the Project owners would use MBC's plans and distribute them for use by others working on the Project.

The "intent" prong of the three-part test for determining

whether an implied nonexclusive license exists itself has at least three considerations. Danielson, 322 F.3d at 41.

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts, such as the standard AIA contract, providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

Id. (quoting Nelson-Salabes, Inc. v. Morningside Dev., LLC, 284 F.3d 505, 516 (4th Cir. 2002)). In making its determination, the Court does not focus on the subjective intent of the putative licensor, but rather makes an objective inquiry into the facts that manifest contractual intent. Danielson, 322 F.3d at 42.

1.    Short-term Discrete Transaction or Ongoing Relationship

MBC contends that it had an ongoing relationship with the Project owners because MBC was engaged in all stages and aspects of the design of the subdivision. Pl. Obj., ¶ 42. MBC claims that its involvement on the Project lasted approximately one and one-half years. Id. Defendants neither dispute MBC's assertions as to extent and length of MBC's participation in the Project prior to being terminated, nor have they put forth any evidence that supports a finding that MBC's engagement should be

12

considered short-term.  Therefore, the Court finds that the length of the relationship between MBC and the Project owner in this case weighs in MBC's favor since it intended to remain involved in the job.

2.   <u>Notice of Use Restriction</u>

A second consideration in determining a copyright owner's intent to grant a nonexclusive license is whether the owner used written contracts providing that copyrighted materials could only be used with the creator's future involvement or express permission.  After reviewing the evidence in the record, the Court finds that the contract language used here weighs heavily in the defendants' favor.

MBC concedes, as it must, that the written contracts did not expressly state that the copyrighted plans could only be used with the creator's future involvement.  Pl. Obj., ¶ 46.  Indeed, the contract language used recognizes that the Project owner might use MBC's subdivision plans without MBC's involvement. Paragraph 14 of the General Terms and Conditions, included as Attachment A to the Professional Service Agreement, provides that the Client [Project owners] could "make and retain copies" of all documents created by MBC "for information and reference in

13

connection with the use and occupancy of the Project by the Client and others."  See MBC General Terms and Conditions, ¶ 14, Pl. Obj., Ex. C (emphasis added).  That MBC was aware that others working on the Project would use its documents is further evidenced in the following sentence where MBC warned that "such documents are not intended or represented to [sic] suitable for reuse by Client or others on extensions of the Project or on any other Project."  Id. (emphasis added).  MBC further warned in the same paragraph that "[a]ny reuse without written verification or adaptation by [MBC] for the specific purpose intended will be at Client's sole risk and without liability or legal exposure to [MBC] or to [MBC] sub consultants, and Client shall indemnify and hold harmless [MBC] and [MBC] sub consultants from all claims, damages, losses and expenses, including attorneys' fees arising out of or resulting therefrom."  Id.  The contract language used in this case is nearly opposite that used in cases where courts have held that a nonexclusive license to use copyrighted architectural plans did not exist.  See Danielson, 322 F.3d at 41 (architect and client signed standard AIA contract providing that the plans "shall not be used . . . for other projects, for additions to this Project, or for completion of this Project by

14

others . . . except by agreement in writing and with appropriate compensation"); Nelson-Salabes, 284 F.3d at 516 (plaintiff architectural firm submitted contracts to client that contained standard AIA prohibition against use of its drawings without the plaintiff's future involvement or consent); Johnson v. Jones, 149 F.3d 494, 498-500 (6th Cir. 1998) (AIA contracts provided by architect showed intent not to grant license for use of the architect's work by others without express permission).

The facts of the instant case are analogous to those in Foad Consulting Group, Inc. v. Musil Govan Azzalino, 270 F.3d 821 (9th Cir. 2001), where an engineering firm that created a plot plan for a shopping center project sued a developer and a firm hired by the developer alleging copyright infringement. There the court found that the inclusion of an indemnification clause similar to that used by MBC, as well as the absence of any prohibition in the contract against modification by others, evidenced the plaintiff's intent to grant an implied license to hire others to create derivative works for the purpose of completing the project. Id. at 830. Likewise here, the language used by MBC evinces an intent to grant the Project owners permission to use MBC's subdivision plans to complete the

15

Project, and to except MBC from any liability that might arise from any reuse or adaptation of the plans without MBC's involvement. The Court finds the language used in the written contracts in this case is dispositive as to the existence of an implied nonexclusive license to the Project owner to use MBC's subdivision plans, with others, in completing the Project. Therefore, the Court further finds that the defendants are immune from copyright infringement claims arising from their use of the plans to complete the Project. See Danielson, 322 F.3d at 40.

3. Creator's Conduct During Creation or Delivery

A third consideration in determining the copyright owner's intent is whether the copyright owner's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible. The Court finds that the contract language discussed above is determinative of this issue. Paragraph 14 of MBC's General Terms and Conditions provided that the Project owner could make and retain copies of MBC for use by the Project owner and others in completion of the Project. While there is no dispute that MBC objected when it learned that the defendants had replaced it on the Project, MBC had already expressly granted the

16

Project owner permission to allow others to use MBC's documents in completing the Project. MBC has not pointed to any evidence in the record that demonstrates that the Project owner agreed that MBC would be the only entity providing surveying and engineering services on the Project, or that MBC evinced any intent to contract for such a condition in granting the Project owner permission to use its plans. MBC's subjective intent, expressed after it was terminated from the Project, is insufficient to carry the day.

In sum, the Court finds that an implied nonexclusive license exists that extended to defendants' work on the Project. Where the issue is the scope of the license, and not its existence, the copyright owner bears the burden of proving that defendant's use was unauthorized. Graham, 144 F.3d at 236. Here, MBC has not offered any evidence that raises a genuine issue of fact as to whether the defendants exceeded the scope of the implied nonexclusive license. Accordingly, the Court finds that the defendants are entitled to summary judgment on MBC's copyright infringement claim.

B. Doctrine of Merger and Grant of Express Retroactive License

Defendants have further argued that they are entitled to

summary judgment based on the affirmative defenses of doctrine of merger, and because they contend that MBC granted the succeeding Project owner a retroactive license that should be construed to apply to the defendants.  Because the Court finds that the defendants are entitled to summary judgment based on the affirmative defense of implied nonexclusive license, the Court does not address these alternative arguments.

Conclusion

For the reasons set forth above, defendants' motions for summary judgment (document nos. 11 and 12) are granted.  The Clerk of Court is directed to dismiss defendants Eric Mitchell, Richard Ladd and Eric Mitchell & Associates, Inc., from the case. A damages hearing shall be scheduled as to defendant Harley G. Blettner, against whom a default was previously entered (document No. 10).

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: April 15, 2004

cc:  Michael D. Hatem, Esq.
     Paul M. DeCarolis, Esq.
     Michael S. Owen, Esq.