**Buckley H. CRISPIN, an individual, Plaintiff,**

v.

**CHRISTIAN AUDIGIER, INC., a California corporation, et al., Defendants.**

**No. CV 09–9509 ABC (JEMx).**

United States District Court, C.D. California.

Dec. 12, 2011.

Scott A. Burroughs, Stephen M. Doniger, Regina Y. Yeh, Doniger Burroughs APC, Culver City, CA, for Plaintiff.

Michael A. Bowse, Browne George Ross LLP, Courtney E. Curtis, James C. Potepan, Ropers Majeski Kohn and Bentley, Joseph Connolly, John M. Moscarino, McLeod Moscarino Witham & Flynn LLP, Jan A. Yoss, Younesi & Yoss LLP, Los

Angeles, CA, Kevin R. Martin, Patton Martin & Sullivan LLP, Pleasanton, CA, for Defendants.

ORDER GRANTING IN PART AND DENYING IN PART CROSS–DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

AUDREY B. COLLINS, Chief Judge.

Pending before the Court is Defendant Christian Audigier, Inc.'s ("CAI") and Audigier Brand Management Group LLC's ("ABMG") (collectively, "Audigier" or "Audigier entities") Motion for Summary Judgment as to all Cross–Claims Asserted by New Life, filed on June 6, 2011. Cross-claimants New Life Company LLC ("New Life") filed an Opposition on October 17, 2011, and Audigier filed a Reply on October 24, 2011. The matter was heard on December 12, 2011. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Motion.

## I. BACKGROUND

Plaintiff Buckley Crispin sued the Audigier entities for copyright infringement, breach of contract, and several related claims arising from Audigier's use of twelve pieces of Plaintiff's artwork (the "Artwork") on various of its branded products. Specifically, Crispin, a professional tattoo artist, alleged that in the fall of 2005, he produced the Artwork for Audigier and granted Audigier a nonexclusive license to use the Artwork on its Christian Audigier line of apparel. Crispin contended that Audigier exceeded its limited license by using the Artwork on items other than apparel, such as on sex products, watches, dog accessories, and jewelry, and/or by sublicensing the Artwork without Plaintiff's express permission, all of which infringed Crispin's copyrights. Crispin also contended that Audigier breached their contract by failing to in-clude his seal on items bearing the Artwork. Crispin also sued a number of Audigier's alleged sublicensees, including New Life, for copyright infringement for manufacturing and/or selling goods bearing the Artwork.

On December 23, 2010, New Life filed a Cross–Complaint against Audigier for fraud, negligent misrepresentation, equitable indemnification, implied indemnification, and breach of contract. New Life asserts that Audigier granted it a license to produce Audigier-branded condoms and other sex products bearing the Artwork. In their License Agreement, Audigier represented that it owned and controlled the intellectual property that it was licensing to New Life. New Life argues that in light of Crispin's lawsuit against it for copyright infringement, Audigier's warranty that it owned and controlled the copyrights was false. New Life asserts that it has suffered losses directly from Audigier's misrepresentations and because of the resulting litigation. Because all of Crispin's claims against New Life stem from the license Audigier granted to New Life, New Life also seeks equitable and implied indemnification from Audigier. New Life adds that Audigier has defended and indemnified every other licensee in the lawsuit except New Life. New Life also asserts that Audigier breached the License Agreement by unreasonably withholding approval of its designs.

In September 2011, Crispin settled with Audigier. As part of that settlement, in exchange for an undisclosed payment from Audigier, Crispin transferred the Artwork and the copyrights therein to Audigier and dismissed his complaint against all defendants, including New Life. This settlement did not resolve New Life's cross-claim against Audigier.

Audigier seeks summary judgment against New Life on several grounds.

First, Audigier contends that each of New Life's claims is based on the allegation that Audigier did not have the right to sublicense Crispin's Artwork. Audigier argues that all of New Life's claims fail because it is undisputed that Audigier did possess the right to sublicense that Artwork. Second, Audigier contends that New Life's fraud, misrepresentation, and contract claims (first, second, and fifth causes of action) fail because New Life cannot show that it suffered damages. Specifically, Audigier argues that any injuries New Life has suffered were caused by its own conduct because it produced the Audigier-branded condoms before obtaining certain approvals required by the License Agreement. Finally, Audigier argues that New Life's causes of action for equitable and implied indemnification (third and fourth causes of action) are barred by federal law. New Life opposes each of Audigier's grounds for judgment.

## II. STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Where the moving party bears the burden of persuasion at trial, the moving party must show that no reasonable trier of fact could find other than for the moving party. William W. Schwarzer, et al., *California Practice Guide: Federal Civil Procedure Before Trial*, § 14:124–127 (2001). The moving party's burden extends to each element of the claim or claims on which it seeks summary judgment or summary adjudication. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) ("As the party with the burden of persuasion at trial, the [plaintiff] must establish 'beyond controversy every essential element of its [ ] claim.' "); Schwarzer, *supra*, § 14:124–127.

Once the moving party satisfies its initial burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings ... [T]he adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. Pro. 56(e); *S. Cal. Gas Co.*, 336 F.3d at 888 ("[The non-moving party] can defeat summary judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor.") (citations omitted).

An issue of fact is genuine if it reasonably can be resolved in favor of either party. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. "[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues." *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir.1992). Rather, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, the court must view the evidence presented "through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505.

But "mere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989). The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. The "opponent must do

more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. DISCUSSION

The resolution of this Motion turns in part on the nature of the agreement between Crispin and Audigier. Crispin contended that he granted Audigier only a limited license: to allow Audigier to use the Artwork on the Christian Audigier line of apparel. Audigier, by contrast, contends that one of its entities, CAI, bought the Artwork outright, and that there was a transfer of ownership of the copyrights. The import of Audigier's contention is that it was free to use the Artwork as it wished. Audigier argues, in the alternative, that Crispin granted it a license to use and sublicense the Artwork in any way it saw fit.

### A. Whether Audigier was Entitled to Place the Artwork on Condoms, or Sublicense a Third–Party to Do So, Is Genuinely Disputed.

Audigier argues that its representations to New Life that it owned, controlled, and/or was authorized to license the Artwork were true. Accordingly, Audigier argues, New Life's claims fail. The Court finds that genuine issues of material fact preclude summary judgment on this issue.

### 1. Crispin Did Not Transfer the Copyrights to CAI.

First, Audigier argues that Crispin transferred the Artwork, including the copyrights thereto, to CAI in 2005 (or that "it was the intention of Crispin and CAI that CAI would own the copyrights to the Crispin Artwork." Mot. 6:28–7:1). Specif-

ically, Audigier contends that an unsigned writing purportedly evidencing the parties' intent to transfer the copyrights together with Crispin's acceptance of checks from CAI effected a transfer of copyright from Crispin to CAI. This position is not supported by copyright law.

Under the Copyright Act, "[a] transfer of copyright ownership ... is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Here, Audigier states that an agreement dated November 23, 2005 and entitled "Commissioned Artwork/Work for Hire Agreement" memorialized the parties' purchase and sale of the Artwork.[1] *See* Mot. 8:15–17; Bowse Decl. Exh. G.) Audigier concedes that Crispin never signed the agreement, but points out that Crispin accepted a check for $3,300 five days later, and several more checks shortly thereafter in payment for the Artwork. Mot. 8:17–22; Bowse Decl. Exh. D, E). Audigier argues that the unsigned agreement together with Crispin's acceptance of payment are sufficient to satisfy section 204(a)'s requirement of a signed writing and effected a transfer of copyrights to CAI.

 In the Ninth Circuit, there is no room for injecting such a nuance into section 204(a)'s unambiguous language: "Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have

---

**1.** Although the document is titled, in part, "Work for Hire," Audigier does not argue that the Artworks are works for hire.

to be the Magna Charta; a one-line pro forma statement will do." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir.1990). *See also Radio Television Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 929 (9th Cir.1999) (stating, "Section 204(a) has a simple requirement in order for a grant of an exclusive license to be valid—put it in writing. If the parties really have reached an agreement, they can satisfy § 204(a) with very little effort. Here, there is no genuine issue of material fact as to whether that minimal step was taken: it was not.") In short, "the law couldn't be clearer . . . the Copyright Act invalidates a purported transfer of ownership unless it is in writing." *Effects Associates*, 908 F.2d at 556.

The Ninth Circuit has consistently found putative copyright transfer agreements that have not complied with § 204(a) to be ineffective. *See, e.g., Radio Television Espanola*, 183 F.3d at 927 (series of faxes and an internal deal memo insufficient to transfer copyrights under section 204(a)); *Konigsberg Int'l Inc. v. Rice*, 16 F.3d 355, 356–57 (9th Cir.1994) (letter from author to movie producer alluding to oral agreement reached three-and-a-half years earlier not the type of writing contemplated by section 204(a)); *Effects Associates*, 908 F.2d 555 (rights to special effects created expressly for a specific film not transferred by oral agreement). By strictly enforcing section 204(a)'s minimal requirements, courts can best effect the purposes of the Copyright Act: to ensure certainty of ownership and protect a copyright owner's rights. *See, e.g., Effects Associates*, 908 F.2d at 557 (stating section 204's writing requirement not only protects authors from fraudulent claims, but also "enhances predictability and certainty of ownership—Congress's paramount goal when it revised the Act in 1976 . . . Rather than look to the courts every time they disagree as to whether a particular use of

the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights.") *See also, Konigsberg Int'l*, 16 F.3d at 356–357 (stating, "the writing must ensure that the author will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price. The writing should also serve as a guidepost for the parties to resolve their disputes.") (citations omitted). The disagreement between Crispin and Audigier concerning Audigier's right to use the Artwork is precisely the sort of problem that the Copyright Act seeks to prevent by requiring a signed writing.

■ Based upon section 204(a) and Ninth Circuit precedent, it is clear that the combination of the unsigned agreement and the checks upon which Audigier relies does not constitute an "instrument of conveyance" or a "note or memorandum of the transfer" of copyright interests. Although the written agreement appears to have been prepared for Plaintiff's signature, he never signed it. The alleged transfer of copyrights here did not comply with section 204(a)'s simple requirements; it is therefore invalid and unenforceable.

The out-of-circuit district court case upon which Audigier relies for its argument that the unsigned agreement plus the signed checks create at least a triable issue of fact is readily distinguishable. In *Johnson v. Tuff–N–Rumble Management, Inc.*, 2000 WL 1145748 (E.D.La.2000), the court found that an unsigned contract and a signed check were sufficient to convey copyright interests. Crucially, the operative check bore a legend stating that it was for "assignment of Johnson's copyrights to Tuff City agreement dated June 17, 1997." *Johnson*, 2000 WL 1145748 at *6. This

legend "clearly indicate[d] that an ownership interest in copyrights [was] being transferred." *Id. Johnson* cites several other cases holding that an endorsed check bearing an appropriate legend may be effective to transfer copyrights. *See Id.* at *5. Here, the checks bear no legend, so *Johnson* is not persuasive.

The unsigned agreement and the endorsed checks are, as a matter of law, insufficient to satisfy section 204(a)'s simple requirement of a signed writing. Crispin did not transfer any copyrights to CAI in 2005.

### 2. Whether CAI Obtained a License From Crispin Permitting CAI to Sublicense New Life to Place the Artwork on Condoms is a Genuinely Disputed Triable Issue of Fact

Audigier argues, in the alternative, that CAI obtained a nonexclusive oral license from Crispin that permitted it to use and sublicense the Artwork in any way it wanted, including to place the Artwork on condoms and to sublicense New Life to do so. This aspect of the Motion therefore breaks down into three sub-issues: (1) whether Crispin granted CAI a nonexclusive license; if so, (2) whether the license allowed this particular use (for CAI to place the Artwork on condoms); and if so, (3) whether the license permitted CAI to sublicense New Life to place the Artwork on condoms.

---

**2.** The leading treatise on copyright law suggests that, if an oral contract provides unambiguously for the transfer of a copyright to be exclusive, "the statutory bar on exclusive grants being executed orally **invalidates** the subject contract from taking effect." *See Nimmer on Copyright* § 10.03[A][7] (emphasis added). Yet several circuits, including the Ninth Circuit, have found that where an attempted oral transfer of copyright fails under section 204(a), a nonexclusive license may

### a. Crispin Granted CAI a Nonexclusive License to Use the Artwork.

■ Under section 101, "nonexclusive licenses" are expressly excluded from the definition of "transfer of copyright ownership." Nonexclusive licenses can therefore be granted without compliance with section 204(a)'s writing requirement. Under this "narrow" exception to section 204(a), *Effects Associates*, 908 F.2d at 558, a nonexclusive license can be transferred *by express oral agreement* or *by implication. Foad Consulting Group, Inc. v. Azzalino*, 270 F.3d 821, 826–828 (9th Cir.2001) (so stating). An oral agreement, like a written one, can have both express terms and implied terms. But when the agreement is oral, the lack of a writing is an evidentiary problem that makes it more difficult to determine what the express terms are. *See* 3 Melville B. Nimmer & David Nimmer. *Nimmer on Copyright* § 10.03[A][7] (2001) (discussing difficulty of ascertaining terms of oral license).

Thus, although the' Court finds that Crispin did not transfer his copyrights in the Artwork to CAI, it appears that Crispin granted CAI, orally or by implication, a nonexclusive license to use the Artwork.[2] Indeed, Crispin never contested that he granted CAI a nonexclusive license to use the Artwork. Rather, Crispin and Audigier disagreed about the scope of the license. Before addressing the scope of the license, the Court will discuss the law pertaining to implied terms.

---

nevertheless be implied from the parties' conduct. *See, e.g., Effects Associates*, 908 F.2d at 558–559. Although the Court is bound to follow this approach, it may be inconsistent with contract law: "To [accord partial significance to the attempted transfer] would raise serious questions under contract law, as the enterprise would plainly contravene the mutual intent of the parties." *Nimmer,* supra, § 10.03[A][7].

### b. Law Relating to Implied Licenses

Where a license or its terms may be implied, "[f]inding there was an implied license does not end the inquiry [ ]. We must also ask what the scope of this license was, and whether [Defendant] exceeded it. *See Oddo v. Ries,* 743 F.2d 630, 634 (9th Cir.1984) (implied license to use articles in a manuscript did not include license to use them in a book)." *Foad,* 270 F.3d at 838 (Kozinski, J., concurring).

■ With regard to implied terms, a "seller grants a buyer an implied license to use a product for the purpose for which the seller sold it to the buyer." *Foad,* 270 F.3d at 827. "An implied license is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Asset Marketing Systems, Inc. v. Gagnon,* 542 F.3d 748, 754–755 (9th Cir.2008) ("*AMS*") (citations omitted).

■ But the Court is not free to find any conceivable implied term. While it is true that "Congress did not choose to regulate the conditions under which a copyright holder can grant a nonexclusive copyright license to another," *Foad,* 270 F.3d at 827, the manner in which the Court construes such a license must still be consistent with the Copyright Act. Accordingly, "state law determines whether a copyright holder has granted [a nonexclusive] license [*so long as it does not conflict with the Copyright Act*]." *Id.* (emphasis added). *See also S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1088 (9th Cir.1989) ("We rely on state law to provide the canons of contractual construction, but *only to the extent such rules do not interfere with federal copyright law or policy.*" (emphasis added)).

### c. Whether the Nonexclusive License Permits CAI to Apply the Artwork to Condoms is Genuinely Disputed.

■ Assuming that the three-part test set out in AMS is satisfied such that Audigier obtained from Crispin an implied nonexclusive license to use the Artwork—a fact that New Life does not appear to dispute—the scope of that license is genuinely disputed. Indeed, because the license here is implied and because much of the evidence bearing on the parties' understanding is oral, it is difficult to determine the scope of the license.

The parties testified to different understandings of their "agreement". For example, CAI's then in-house counsel David Nisenbaum testified that Plaintiff was told "that there would be an exploitation of the artwork in the same manner that Ed Hardy had exploited [ ] artwork." (Nisenbaum Depo. 99:16–19.) Nisenbaum also testified that Plaintiff "was advised that products that the Christian Audigier line was going to [ ] put out were going to be similar to the Ed Hardy line" and that Plaintiff "knew we were going to be putting it on many other products [besides T-shirts and hats]." (Nisenbaum Depo. 103:1–10, 104:15–18.) Nisenbaum testified that he told Crispin that Audigier would be placing the Artwork on anything it wanted, even toilet paper if it wanted to. (*Id.* at 35:6–23.) Nisenbaum also testified that Crispin was told that Audigier would sublicense the Artwork extensively, a right he believed CAI had because CAI had title to the Artworks and their copyrights. (*Id.* at 17:24–19:1.) Crispin was also told that the Christian Audigier line was going to be a "lifestyle brand ... just like Ed Hardy." (Nisenbaum Depo. 39:24–40:2; *see also Id.* at 103:1–10.) In the parlance of Audigier's industry, "lifestyle brand" evidently encompasses items beyond apparel. Having

been so told, Crispin created the Artwork and delivered it to CAI.

Crispin, by contrast, testified that he never agreed that CAI could place the Artwork on condoms. Crispin testified to the effect that he understood that the Artwork would be used on a Christian Audigier clothing line, or for clothing created specifically for the retailer Spencer Gifts, but that it was not entirely clear. *See, e.g.,* Crispin Depo. 15:7–14, 113:13–19; *see also Id.* at 60:8–15 (he "assumed [the Artwork] was gonna be on their T-shirts or whatever they were making, you know"); *Id.* at 61:7–61 (he "[kind] of thought they were gonna use [the Artwork] on things that they already had at that point"); *see also* Buckley Decl. 12/13/2010, ¶ 11 (stating that Audigier "never discussed the range of products that it would allow third parties to manufacture with my artwork"). Indeed, Nisenbaum testified to the effect that he did not discuss specific uses with Crispin (Nisenbaum Depo. at 103:14–18, 104:6–24), and did not recall "ever discussing condoms or lubes with" Crispin. (*Id.* at 103:19–23.) Again, Nisenbaum evidently believed that CAI was obtaining title to the Artwork and therefore didn't need specific permissions from Crispin.

This evidence raises a triable issue of fact as to whether the license included permission for CAI to place the Artwork on condoms. The bulk of the evidence suggests that the parties did not have a clear understanding or establish mutual regarding the scope of the license, such as, for example, whether it encompassed placing the Artwork on clothing only, or also on accessories, or on anything.[3] This lack of clarity precludes the Court from summarily adjudicating the precise terms of the license.

Nor is the evidence sufficient to establish that, even if the outer limits of the license are unclear, the license is nevertheless sufficiently broad to include placement of the Artwork on condoms. The Court cannot conclude from the evidence in the record that Crispin knew of such an application or that such an application was foreseeable to him; nor can the Court conclude that branded condoms are encompassed within Audigier's phrase "lifestyle brand". To the contrary, placement of artwork on condoms is a use far removed from placement on apparel, hats, or shoes; it is a use that common sense suggests an owner of intellectual property might find objectionable. As such, the Court cannot conclude that Crispin agreed (even orally) that CAI could apply the Artwork on condoms; similarly, whether the license impliedly allowed this use is not susceptible to summary adjudication.

### d. Whether the Nonexclusive License Permitted CAI to Sublicense New Life is Genuinely Disputed.

Whether the license permitted CAI to sublicense others to produce its branded condoms is also genuinely disputed. Audigier argues that Crispin granted CAI an unlimited license to use the Artwork in any conceivable way, including to sublicense others. This argument raises the difficult legal question of whether the holder of a nonexclusive licence must obtain the copyright holder's express permission to sublicense, or whether the right to sublicense can be implied.

The cases touching on this question do not answer this precise question and yield unclear guidance. This is due in part to courts and parties occasionally employing the concepts "assign" and "license" and "sublicense" interchangeably (*see, e.g.,*

---

**3.** This is evidently because at least one party, CAI, believed that Crispin had transferred ti- tle and that the parties were not entering into a license agreement.

*Gardner, infra* ); by courts occasionally not clearly articulating the bases upon which they are implying a license or a term (*see, e.g., Foad,* 270 F.3d at 832–838 (Kozinski, J., concurring)); and by courts and parties conflating the terms "oral agreement" and "implied agreement." Perhaps precision is hard to achieve where, as here, the court is charged with describing the parameters of a legal relationship which the parties themselves left ill-defined, and must do so in a manner reflective of the parties' mutual intent or, in the absence of mutual intent, reflective of their course of conduct, *but also* in a manner consistent with the Copyright Act. In any event, as discussed below, these cases can be synthesized into a coherent and sensible approach.

In *Gardner v. Nike, Inc.,* 279 F.3d 774 (9th Cir.2002), the Court found that an exclusive licensee whose license was silent as to a right of assignment *could not* assign that license without the copyright holder's express consent. The Court discussed "strong policy reasons to place the burden on the licensee to get the licensor's explicit consent," stating that "[p]lacing the burden on the licensee assures that the licensor will be able to monitor the use of the copyright." *Gardner,* 279 F.3d at 781. Accordingly, the Court held that "an exclusive licensee has the burden of obtaining the licensor's consent before it may assign its rights, absent explicit contractual language to the contrary." *Gardner,* 279 F.3d at 781.

Similarly, in the patent context, which is persuasive for copyright issues, *see Gardner,* 279 F.3d at 778, Ninth Circuit precedent establishes that a nonexclusive licensee may not assign its license without the patent holder's express permission. In *In re CFLC, Inc.,* 89 F.3d 673 (9th Cir.1996) (also referred to as *"Everex"*) the Ninth Circuit addressed whether, over the patent holder's objection, a Chapter 11 bankruptcy debtor could assign its nonexclusive patent license to a buyer. The Court noted that "[t]he construction of a patent license is generally a matter of state contract law, except where state law 'would be inconsistent with the aims of federal patent policy.'" *In re CFLC,* 89 F.3d at 677–678 (citation omitted). The Court then observed that "[t]he fundamental policy of the patent system is to encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design by granting the inventor the reward of the exclusive right to practice the invention for a period of years". *Id.* at 679 (internal citation omitted). The Court then noted that to permit state law to allow an assignee, even a nonexclusive one, to assign or sublicense by implication would undermine this fundamental policy of patent law because it would allow the nonexclusive licensee to become, in effect, a potential competitor with the patent holder in the market for licenses. *Id.* at 679. This reasoning also applies to copyrights because patent and copyright policy have the same purposes. *See* U.S. Const. Art. I § 8, cl. 8 (purpose of the Patent and Copyright clause is "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.")

By contrast, in *Foad Consulting Group, Inc. v. Azzalino,* 270 F.3d 821 (9th Cir. 2001), the Ninth Circuit relied on a contract between an architect and a developer that did not convey copyrights to find that the architect had granted the developer a nonexclusive *implied* license to reproduce certain architectural plans, to employ a third-party to adapt the plans to create the final plan, and to publish the plan "for the purpose of completing the project," which was the development of a shopping center. *Foad,* 270 F.3d at 826, 830. None of these terms were express, but instead were im-

plied based on several factors including the parties' relationship and surrounding circumstances. Arguably, this holding suggests that authority to sublicense can be implied and need not be express.[4]

Similarly, in *Effects Associates v. Cohen,* 908 F.2d 555 (9th Cir.1990), the Ninth Circuit held that, because there was no signed agreement transferring rights, a creator of special effects footage did not convey the rights in that footage to the production company for whom it made that footage. *Effects Assocs.,* 908 F.2d at 556–557. However, the Court also held that because "Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it ... [Effects] at the same time convey[ed] a license to use the footage" in the film. *Id.* at 558–559. The Court concluded that "Effects impliedly granted nonexclusive licenses to Cohen and his production company to incorporate the special effects footage into [the film] and to New World Entertainment to distribute the film." *Id.*

Although ostensibly in conflict, these cases can be reconciled. In those cases in which the court would not imply a right, the licensee was attempting to assign its license in a way that harmed the owner's retained interest in the property. Specifically, in *Gardner,* an exclusive copyright licensee sought to completely re-assign its license to a third party; in *In re CFLC,* a nonexclusive patent licensee also sought to re-assign its rights to a third party. In both cases, by seeking to assign their rights away to a third party, the licensees were usurping the owner's prerogative of determining who could use the property and how. Although those cases involved outright assignments of licenses, the same

reasoning would apply for a licensee who issued a third party an independent sublicense: such sublicensing would allow the sublicensee to use the intellectual property for a purpose wholly different from, and independent of, the purpose for which the licensee was granted its license. Were a licensee vested with such authority by implication, that would usurp the property holder's retained right to control its intellectual property.

In those cases in which the Court did find an implied right, the licensee sublicensed others to perform certain work necessary to effectuate the purpose of its own license. Thus, in *Foad,* in order for the developer to complete the building project for which the architect prepared plans, the developer needed to employ others to modify and publish the plans. Because the developer's "sublicensing" was simply a function of the work the developer needed to do pursuant to its license, the court held that the architect granted the developer the implied right to sublicense in those particular ways, for the specific purpose of completing the project for which the architect created the plans. Similarly, in *Effects Assocs.,* when the owner of the special effects company granted a production company the right to use footage in a film, he also granted the production company the right to sublicense a third party to distribute that footage as part of the film, because distribution is part and parcel of film production.

Based on this reading of the law, whether Crispin granted CAI the right to sublicense the Artwork to New Life is a triable issue of fact. Audigier claims that Crispin granted CAI the unlimited right to use the

---

4. *Foad* is a difficult case to decipher and apply. *See Nimmer on Copyright* § 10.03[A][8] (stating *Foad* addressed "the conundrum whether parol evidence can vary something not in writing to begin with" and stating that this question "tied one panel of the Ninth Circuit into knots.") This difficulty in teasing out *Foad's* meaning necessarily invites caution when applying the case in another context.

Artwork in any way it saw fit, including to sublicense it to anyone, for any purpose. Although there is some evidence in the record that CAI told Crispin about sublicensing, the evidence does not compel a finding that Crispin *expressly agreed* to allow unlimited sublicensing. Nor can the court *imply* such an unlimited licensing term: the principles set out in *In re CFLC* suggest that such an unlimited sublicensing term must be express because implying such a term would be inconsistent with copyright law. Specifically, if CAI possesses the right to grant unlimited sublicenses to the Artwork, that would make CAI Crispin's competitor in the market for licenses and would undermine Crispin's retained rights to control the use of his Artwork. Because this would vest Audigier with profound influence over the use and value of Crispin's Artwork in conflict with Crispin's retained rights, such authority, to be consistent with the Copyright Act, must be obtained by express grant. For the court to find that Crispin impliedly granted CAI such broad authority would conflict with the purposes of the Copyright Act. The Court cannot, therefore, summarily find that Crispin granted CAI, either expressly or impliedly, the unlimited right to sublicense the Artwork to anyone it wanted to.

Insofar as Audigier is claiming that CAI's license permits it to sublicense third parties to the extent necessary to create and market the goods authorized to bear the Artwork—such as to sublicense others to produce those goods—that claim turns on whether the license granted CAI permission to use the Artwork on those particular goods. As applied to New Life's claim, therefore, whether CAI's license allowed it to sublicense New Life turns on whether CAI's license allowed it to apply the Artwork to condoms. As discussed above, this is a genuinely disputed, triable issue of fact.

For the foregoing reasons, whether CAI's license authorized it to place the Artwork on condoms, or to sublicense New Life to do so, is a triable issue of fact.

**B. Whether New Life Obtained Audigier's Approval Before Using the Artwork is Genuinely Disputed.**

■ Audigier argues that New Life's claims also fail because New Life never obtained Audigier's approval of the items it produced as required by their agreement, and therefore had no right to manufacture any of those items. As such, Audigier claims that New Life's claimed damages were caused not by Audigier's alleged misrepresentations but instead were caused by New Life's failure to obtain necessary approvals from Audigier. New Life contends that it did submit samples for approval, and that Audigier actually provided New Life with the designs it was to use, thereby "approving" those designs.

Resolution of this part of the Motion depends in part on the terms of the parties' Licensing Agreement ("Agreement"), attached to the Cross–Complaint as Exhibit 1. The following terms are relevant:

¶ The Agreement required New Life to submit specified items, including "photography, cartons, containers, ... wrappers, packaging, ... artwork and printing, marketing and promotional materials" including actual product prototypes and manufactured samples to ABMG for approval. (Undisputed Fact 5; Agreement section 7.3.1.)

¶ The Agreement required New Life to submit these items for approval with a completed Licensed Product Approval Form. (Undisputed Fact 6; Agreement section 7.3.1.)

¶ The Agreement provided that "in no event shall Licensee commence or permit the manufacture, advertising, promotion, sale or distribution of any of the [prod-

ucts] unless and until the Licensee has received Licensor's written approval of the samples provided pursuant to this Section." (Undisputed Fact 7; Agreement section 7.3.1)

¶ The Agreement stated that "Failure of Licensor to approve such Product Samples or Materials within fifteen (15) business days after the receipt of such samples will be deemed approval." (Agreement section 7.3.2.)

Audigier contends that New Life never submitted any product prototypes or manufactured product samples as required by section 7.3.1. *See* Undisputed Fact 8.[5] However, the evidence Audigier cites, the Declaration of Joe D'Aversa, does not say that New Life *never* submitted samples. Rather, D'Aversa, who was responsible for approving product designs for Audigier licensees, states that New Life did not submit samples to him "until after I discovered that New Life was already showing samples of those products at a trade show without prior approval." D'Aversa Decl. ¶ 3. Indeed, through David Nedhar, one of its agents, New Life essentially admits not submitting samples before the trade show. But New Life further asserts that it sent samples by overnight mail to D'Aversa when he asked for them the day before the trade show, and that D'Aversa gave New Life "verbal approval of the product, and authorized [New Life] to go forward with the convention." Nedhar Decl. ¶¶ 9–10. New Life also states that it never received any communication disapproving the samples. *Id.* at ¶ 10.

Nedhar also states that he and others from New Life had several meetings with Audigier's representatives, including Christian Audigier, to discuss the products and embarking on a large-scale joint marketing effort. New Life brought samples of its products to these meetings, and none of Audigier's representatives indicated that New Life could not proceed to market the products. *Id.* at ¶¶ 11–12. Vincent Audigier, Audigier's person most knowledgeable, testified at deposition that Audigier supplied New Life with the designs New Life used on the condom packaging, and that this means those designs (if not the execution itself) were approved. (Vincent Audigier Depo. 50:3–51:2, 58:5–11). He also testified that, at some point, New Life provided samples to Audigier and that Audigier never responded that the samples were not approved, because Audigier "only sends approved e-mails." (*Id.* at 57:4–6, 58:19–59:12.) In addition, although Audigier sent New Life periodic notices that it was in default on royalty payments for these products (defaults that New Life asserts it cured), Audigier never notified New Life that its products were not approved. *Id.* at ¶ 15. New Life suggests that if Audigier really did not approve the products, it would have informed New Life of that just as it had informed New Life of its defaults.

Based on all of this evidence, whether New Life obtained Audigier's approval for its products in accordance with the Licensing Agreement is a triable issue of fact. For example, it is genuinely disputed

5. Although Audigier's proffered fact does not specify which declaration it is citing to—the Bowse Declaration or the D'Aversa Declaration—it appears to be citing to the D'Aversa Declaration. New Life objected to the Declarations of Joe D'Aversa and Linda Menzel on the ground that they were submitted late, on October 13, 2011, four days before New Life's Opposition was due. These declarations were certainly filed improperly and striking them would therefore be appropriate. However, neither declaration materially affected the resolution of this Motion. The Court's only reference to these declarations—its brief discussion of the D'Aversa Declaration—illustrates, contrary to Audigier's position, that there are genuine issues of fact.

whether Audigier waived section 7.3.1's requirement that New Life use a specified approval form and obtain approval in writing when D'Aversa allegedly orally approved New Life's samples and instructed New Life to display the products at the trade show. The same reasoning applies to the other requirements of section 7.3.1. In addition, in light of section 7.3.2, New Life's assertion that it never received written disapproval of the samples, together with Audigier's conduct ostensibly approving the samples, also raises a triable issue of fact as to whether the samples were "deemed approved." For the foregoing reasons, it is not undisputed that New Life failed to obtain Audigier's approval of the products and therefore caused its own injuries. Accordingly, the Court **DENIES** Audigier's Motion to the extent it seeks summary adjudication of New Life's claims on the ground that New Life cannot show that Audigier caused its damages.

### C. New Life's Indemnification Claims Fail Because Federal Law Does Not Recognize a Right to Indemnification for Liability Imposed Under the Copyright Act.

New Life asserts claims against Audigier for equitable and implied indemnification for any liability it may incur as a result of Crispin's lawsuit.[6] Audigier argues that these claims are not available under federal copyright law. New Life argues that its indemnification claims do not arise out of copyright but instead are based on Audigier's misrepresentations. New Life also argues that such claims are nevertheless cognizable under the Copyright Act.

Crispin sued New Life for copyright infringement and for two causes of action derivative of his copyright claim (for declaratory relief that Crispin is the owner of the Artwork, and for a constructive trust over infringing products). *See* Second Amended Compl. ¶¶ 49–59, 67–77. Had New Life been held liable to Crispin, that liability would have necessarily been premised on Crispin's copyright infringement claim, which is of course a federal statutory claim. As such, New Life is seeking indemnification for liability imposed on it under federal law and, accordingly, that liability is not premised on its own contract-based claims against Audigier.

■■ "A defendant held liable under a federal statute has a right to indemnification or contribution from another only if such right arises: (1) through the affirmative creation of a right of action by Congress, either expressly or implicitly, or (2) under the federal common law." *Doherty v. Wireless Broadcasting Systems of Sacramento, Inc.,* 151 F.3d 1129, 1130–1131 (9th Cir.1998). Although there appears to be no Ninth Circuit case addressing whether the Copyright Act contemplates a claim for indemnification or contribution, numerous other courts have held that no such right exists under either the Copyright Act or federal common law. *See, e.g., Elektra Entm't Group, Inc. v. Santangelo,* 2008 WL 461536, *2 (S.D.N.Y.2008) ("[c]ourts have held that no ... right [to indemnification or contribution] exist[s] under either the Copyright Act or federal common law"); *see also Pure Country Weavers, Inc. v. Bristar, Inc.,* 410 F.Supp.2d 439, 448 (W.D.N.C.2006) ("This Court, like others, has previously determined that no right of indemnification was affirmatively created (either expressly or implicitly) by Congress in the Copyright Act, and ... this is not one of the 'limited situations' in which the Court should formulate federal common law to create such a right."); *Equity Builders & Contractors, Inc. v. Russell,* 406 F.Supp.2d 882, 885–87 (N.D.Ill.2005) (neither the Copyright Act

---

**6.** New Life does not assert a contractual in- demnification claim.

nor federal common law create a right of contribution); *Arista Records, Inc. v. Flea World, Inc.,* 356 F.Supp.2d 411, 416 (D.N.J.2005) ("[C]ourts have held that copyright infringing defendants can not assert contribution in claims against third parties who allegedly contribute to infringement; neither the Copyright act [sic] nor federal common law recognize a copyright infringer's right to contribution."); *Lehman Bros., Inc. v. Wu,* 294 F.Supp.2d 504, 505 (S.D.N.Y.2003) (holding there is no right to contribution in a copyright case). This Court sees no reason to hold otherwise: New Life has not pointed to any section of the Copyright Act that creates such a cause of action, and this Court is aware of none; and New Life has not shown why this court should recognize a federal common law claim for indemnification in this case.

New Life's reliance on *BUC Intern. Corp. v. International Yacht Council Ltd.,* 517 F.3d 1271 (11th Cir.2008) is unavailing. New Life argues that *BUC International* stands for the proposition that indemnification or contribution claims are available under the Copyright Act. But this is a misreading of the case. *BUC International* held that the *one-recovery rule* applies to damages awards under the Copyright Act to prevent a prevailing plaintiff's double recovery. *BUC International,* 517 F.3d at 1278. In so holding, the Court specifically distinguished the one-recovery rule from claims for indemnification or contribution, and acknowledged that the latter claims were only available under the Copyright Act if Congress created such a right or if the courts created such a right as a matter of federal common law. *Id.* at 1276–1278.

Nor is New Life's brief reference to *Foley v. Luster,* 249 F.3d 1281 (11th Cir. 2001) persuasive. There, the Eleventh Circuit held that a state law indemnification claim was not *preempted* by the Copyright Act. However, as the court in *Equity Builders, supra,* observed, "[t]he *Foley* court . . . only addressed . . . whether the federal statute preempted state law under the Supremacy Clause, *leaving open the question as to whether substantive law authorizes such a claim* for indemnification (or contribution) . . . [Th]e absence of a constitutional bar is not the same as the presence of a right to bring a claim (Melville B. Nimmer and David Nimmer, Nimmer on Copyright, § 12.04[C][4], at 12–128–29)." *Equity Builders,* 406 F.Supp.2d at 886 (emphasis added). The *Equity Builders* court then analyzed whether the Copyright Act authorized such indemnification claims, and whether it should fashion a federal common law claim, and answered both questions in the negative. *Id.* at 886–887. This court finds the reasoning in *Equity Builders*—which is consistent with the reasoning set out in the other cases that have addressed these issues—persuasive and sees no reason to depart from it.

 For the foregoing reasons, claims for equitable and implied indemnification are not available for liability imposed by the Copyright Act, nor does the federal common law recognize such claims. Accordingly, New Life cannot pursue its claims for equitable and implied indemnification against Audigier, and the Court **GRANTS** judgment for Audigier on those claims.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Audigier's Motion as to New Life's third and fourth causes of action for equitable indemnification and implied indemnification, respectively. Those claims are therefore **DISMISSED with prejudice.**

Audigier's Motion is **DENIED** in all other respects.

**SO ORDERED.**